Thank you, Chief Judge Kaczynski, and may it please the Court, David Frederick for Kaiser Foundation. Although there is, to be sure, a lot going on in this case, I'd like to focus the Court's attention on two rather elementary errors made by the MDL Court, and they may be found at pages 174 and 175 of the excerpts of record. They concern the Walker Process Claim brought by Kaiser. On page 174 of the excerpts of record, the MDL Court held that Mr. Wong, the assistant examiner, saw the English translation of the Sumika reference, and thus this did not, quote, impede the full consideration by the patent office of that reference. The Court there is referring to defendant's exhibit or excerpt of record, page 174, where in deposition Mr. Wong did testify to that effect. On the very next page, defendant's excerpt of record 175, Mr. Wong, when asked if he read the Sumika translation, said he did not recall. At the very least, therefore, there is a question that is a disputed issue of fact. So it was Wong that was the examiner? He was the assistant patent examiner. On the 95 patent? On the 207 patent, which is the crucial patent that goes to the Walker Process Claim here. The allegation is that Abbott did not submit the translation that would have established that the 207 patent could not be patented because of the Japanese preexisting application that went to Form 4 Tarazosan. But the question doesn't seem to me whether Mr. Wong read it. The question is whether or not there was fraud. Now, how did this get into the other patent application? Had that been submitted by Abbott? Yes, it was. And importantly, Judge Fletcher, Abbott attempted to distinguish the Sumika reference in the other patent application. And it made its arguments for why that didn't affect the prior patent application. But in the 207 application, where the expert testimony by Kaiser's experts, Mr. Britton and Mr. Manbeck, said it unequivocally would deal with the Form 4 Tarazosan, Abbott not only did not submit the translation we submit, but didn't distinguish the Sumika reference, which would lead a jury to make a reasonable inference that Abbott was intentionally attempting to hoodwink the PTO in its prosecution of this patent application. And if the patent application was procured by fraud, then it follows that everything else, the suits that Abbott brought were objectively baseless, that it had an intent to perpetuate its monopoly on this product for which it was earning 500-plus million dollars per year. Is your argument essentially, if I can characterize it that, the Sumika patent was more relevant as prior art for the 207 patent than for the 095 patent? That's correct. So that if you had thought it relevant to include it in 95, you would for sure have thought it relevant in 207. That's your argument? Absolutely. Yes. And that was confirmed by the patent. And how, since I don't know patents, how would I know that's true? Well, we have expert testimony to that effect, Chief Judge Kaczynski. And this was disposed of on summary judgment where the entity ---- Well, why don't you talk to me about that expert testimony? Well, Mr. Britton looked at the polymorph that was the crystalline form of these various chemical properties to the terazosin and said that the Sumika reference, if properly understood through a translation, would lead the Patent Office to the conclusion that Form 4 of the 207 claim would not be a patentable device or invention. And that does not appear to be seriously disputed by Abbott because unlike in the 095 application where they attempted to distinguish the Sumika reference, they were silent on the Sumika reference in the 207 application. Now, you're ---- Okay. I'm sorry. Go ahead. Were the two applications prosecuted by the same lawyers? Yes. The same in-house Abbott patent counsel, Mr. Jansen, prosecuted both of the applications. Go ahead. Well, now, Abbott contends that they thought that they had included this translation with the 207. Instead, they submitted only a sort of an abstract, correct? That's correct. Is there some reason why ---- I guess this is furthering your argument, and so I'm freeving a question to the other side. If they say they included it and yet they don't do anything to distinguish it, it seems ---- Why didn't you draw the reasonable inference that ---- And they've included it and distinguished it in the other. It doesn't sound as though they actually intended to include it. That is an inference a reasonable jury could draw, but the MDL court denied the jury the opportunity to look at that disputed evidence. The question of whether this was an inadvertent omission or an intentional one raises an issue of fact, and our submission fundamentally is that that cannot be decided on summary judgment. They may well have arguments for why this is inadvertent, but a jury would be entitled to conclude that there was intent, particularly given the ---- Both 95 and 07 were eventually knocked out based on the Sumica reference? That's correct. I'm not sure that the 095 ---- Actually, I'm not sure 095 was knocked out on the Sumica reference or on other grounds, but the bottom line was that the generic companies had moved on to the form for Tarazosan, which was the issue in the 207 patent application, and it was all of the lawsuits brought on that application were found to be incorrect and were rejected by courts. Now, secondly, the Laporte citation is a citation reference to a Federal Circuit case that says that you do not have to know about the prior sale or have knowledge of the chemical properties of it in order to apply to the on-sale bar of the patent laws. Now, importantly, here the MDL court, and this is on page 175 of the excerpts of record, said there was no evidence of willfulness. But Kaiser's expert, Mr. Manbeck, and this is at the excerpts of record, page 86, says that is false, because if you look at the language of what Abbott had submitted in a prior brief, it is almost word for word what it submitted in its 207 application, except the reference to the Laporte case. And the reason why this is important is that Laporte had directly rejected the legal basis on which Abbott was attempting to explain away the prior sale of the Tarazosan that had been sold to Geneva several years before and undisputedly would have qualified for the on-sale bar because it was prior to one year before the patent application. Now, my understanding is that the Walker process fraud applies to fact. So omitting to argue a question of law is not in itself fraudulent? I don't think that's correct, Judge Fletcher. I think that it's important when you look at Walker process fraud as to whether or not the PTO's processes were being subverted. And that can be happening with a failure to disclose legal authority that would make the patent impossible or facts that would tend to disprove it. And, in fact, if you look at the regulations for the Patent Office, they make very clear that a person, because this is an ex parte process, has an extraordinary duty of candor to the PTO. And I'm now referring to 37 CFR 1.56A and B. And in those references, the PTO has a duty of candor to the PTO. And in those references, the regulations require the patent applicant to furnish any information that refutes an argument of patentability. So putting in an on-point reference to a case that rejects the legal argument made to distinguish the on-sale bar clearly comes within the duty of candor that a patent applicant has to the PTO. And Mr. Manbeck says if you look at the two, the language of the two side by side and all of a sudden the reference to Laporte falls out in the 207 application, one is drawn to the inference that that was an intentional omission, particularly when done by the same lawyer. Scalia. Counsel, I want to see if we could shift to another issue which may moot what we've been talking about, and that is the statute of limitations. Counsel, your opposing counsel argues that there is a statute of limitations bar here, and I would like to hear your response. Manbeck. Sure. I have several responses, Judge O'Scanlan. The first is that the district court made no findings about a statute of limitations. There is no holding by a district court on review. It is functionally a cross appeal without having brought a cross appeal in the formal process. That's my first response. My second response is that they have no answer to the Second Circuit's Berkey photo case. In that case, the Second Circuit held that a purchaser would not be barred under the four-year statute of limitations because of the continuing violation of the perpetuation of the monopoly, so that if you were to think that activities that occurred before the four years in which Kaiser brought the suit would be relevant to determining antitrust injury, under Berkey photo, you simply look at the level of damages in the four-year period because purchasers are treated differently than competitors. And the policy rationale behind that rule is twofold. One is that purchasers cannot be expected necessarily to know all of the competitive shenanigans that competitors get up to when they're competing. This is not a tolling argument. Sorry? This is not a tolling argument. No, it's not. It is an argument that you treat the four-year limitations in a different way. And the second rationale behind that rule is that if a purchaser suffers antitrust injury, the law would not give the benefit of a statute of tolling to the seller who is violating the antitrust laws and thereby harming consumers. That's because antitrust law fundamentally is to protect competition and not to protect competitors. They have basically no answer to the Berkey photo case, except to say that it has been criticized by some commentators. This circuit has not addressed that issue. It is an open issue. We would respectfully submit that as to the question of statute of limitations, the appropriate course for this Court would be to allow proceedings on remand to address whether or not there's any statute of limitations claim that is a viable claim at all. And because the district court in the first instance hasn't addressed that issue, it would be appropriate for it to be done at that time. Now, if we were to do a remand, I'm a little un-I've never dealt with this in quite this fashion. This is an MDL case, and we're dealing with a summary judgment that comes out of the district court in Florida. Would we remand? Would it go back to Florida, or would it go back to the- The case has been transferred. The error, as it has infected the case, was committed in the MDL court, but it would be for Judge Walter to proceed with the Section 2 claim, and that would proceed. And let me go on to say that because of the MDL court's error, Judge Walter committed evidentiary errors on the Section 1 claim thinking that because Section 2 claim had been taken out of the case, that evidence that went into proving the Section 2 violation and the facts surrounding the Walker process fraud had to be restricted from the jury's purview. That then infected the Section 1 claim, and Kaiser respectfully is entitled to a new trial on the Section 1 claim because crucial evidence that went to the Walker process fraud claim also went to establish the antitrust injury that Kaiser sustained as a result of the per se illegal agreement that was entered into between- It sounds like you want a second bite of the apple. No, we want a fair chance to prove the case, Chief Judge Kaczynski, and- What was excluded that would not have been excluded? Give me a for instance. I'll give you- That was excluded on account of the- Geneva argued that it was at risk of finding patent infringement as a result of the litigation that Abbott had brought. It was a classic situation where they bring the lawyer's issue, their analysis into the case, but the judge held that all the important evidence of what the lawyers had determined was protected by the attorney-client privilege. And so when we look at the effect of the Walker process claim, it necessarily goes to the Geneva lawyer's assessment of how the claim, the patent had been procured by fraud. And if that evidence, that analysis by the lawyers was to be what we believe that it is, which is that the 207 patent necessarily is invalid because it was procured by fraud, that would negate the at-risk defense that the Geneva witnesses testified to as the reason for the delayed launch. This was, after all, a error than most generic products. And a jury would be entitled to assess the credibility of the Geneva business witnesses when confronted on cross-examination by the evidence that their lawyers thought the 207 patent was an invalid patent. Now, the judge excused that error by saying the Kaiser lawyers had an opportunity to cross-examine based on board minutes, but those board minutes are quite cryptic. They don't have the same kind of powerful force that the lawyers' assessments of the fraud committed on the PTO would have. And a jury would be entitled to determine that the delayed launch was a direct result of the fraud committed on the PTO. And now, assuming that we agree with you, and this is an assumption, assuming that we agree with you with respect to the 207 and the Walker process fraud, is the district judge in a better position to determine the consequence for trial on a motion for retrial than we are? That is to say, is this a motion better addressed to the district judge on remand rather than for us simply to direct a new trial? Well, let me say this. If you reverse on the Section 2 claim, that has such profound impact on the Section 1 claim, because the Section 1 agreement was done to perpetuate a patent that we allege had been procured by fraud. And in that guise, it would be appropriate, we think, for the district court to have an opportunity to reassess the implications of that on the Section 1 claim. But we think that it would be appropriate for you to say that that should be vacated as well, if I could reserve the balance of my time. Okay. We'll hear from the closing counsel. May it please the Court. I'm Stuart Senator of Lunger, Tolles & Olson. Good morning. I represent Abbott Laboratories, and I'm arguing on behalf of Abbott and on behalf of Geneva with respect to the Section 1 claim that concerns Geneva as well. I think I'd like to turn directly to the Walker process claim. If you wouldn't mind, and this might – I hope this doesn't throw you off too much – if you would address the statute of limitations and the Berkey photo argument. Yes, Your Honor. On the statute of limitations, this Court held in Pace Industries that sham litigation claim, the statute of limitations begins to run at the time that the sham litigation – allegedly sham litigation – is filed. Their distinction with respect to Berkey photo, which, as the Court knows, has been criticized in many respects and is not accepted by the commentators, is that while Berkey photo involved not a competitor but a purchaser, and Berkey photo observed that sometimes a purchaser's injuries don't occur at the same time as a competitor's example of a predatory pricing scheme where you're lowering your price to remove a competitor from the market. And the competitor has an injury right away, but a purchaser won't have an injury until the competitor is knocked out of the market and the monopoly price goes up. But that's not our situation. They're alleging that we, Abbott, were a monopolist because of the patent, and that then, because of the litigation, they couldn't buy at a lower price because other folks weren't coming to market. While their allegation – And I assume you made this argument in the district court. We did. And the district court didn't feel the need to reach the statute of limitations argument because it found other issues dispositive. But statute of limitations was fully briefed, and the law is that this Court can affirm on any basis in the record. Answer the statute of limitations argument. Can we make a determination with respect to that issue here? Or if we have concerns about it, must we send it back? I think you can make a determination as to it here because their allegation of damages, their allegation is that when Nova Farm got tentative approval in 1996 that it could have then come to market, and therefore the monopoly would have gone away and it would have paid lower prices. That's six years before it filed its complaint. So even if one were to accept that Berkey photo reasoning, and I don't think Your Honors should. I think that Pace Industries is the standard in this Court. I think it's perfectly reasonable, appropriate, and the right thing to do to affirm on this other basis in the record. On the basis of the statute of limitations and on the basis that the Berkey photo exception does not apply here, because even though possibly in some circumstances a purchaser will not be injured until years after the fact in a predatory pricing scheme, in our situation that's not applicable as a matter of law. I'm sorry. Why is that? Because in our situation, it's not a situation of the competitor being injured now and then having to wait years and years until the purchaser is injured, as the example given in Berkey photo where the alleged monopolist is My question was not what. I understand what. I'm asking why. Because Berkey photo's reasoning is that I know Berkey photo's reasoning. I'm sorry, Your Honor. I don't have the question in mind anymore. The question is why shouldn't the Berkey photo analysis apply here equally well? I mean, they are a purchaser, right? Their harm would not start until you could expect a competitor to come into market. The competitor doesn't put a drug on market day one that the patent expires. They have to go through a process with FDA. They have to get geared up and so on. So you expect that process to terminate and result in a competing generic product some point after the anti-competitive behavior. So why doesn't that apply to Kaiser here? Because their allegation is that the competitive, that Novapharm would have come to market in 1996 when it got tentative approval, which would have been Well, but that is simply an application of Berkey photo. It's not an ejection of Berkey photo. That is simply saying if you take Berkey photo and you apply it factually to the situation, the time doesn't work out. That's right. You are arguing that Berkey photo shouldn't apply at all, and I just didn't quite get why you said that. I'm sorry. I'm arguing that the Berkey photo situation does not apply here, that the factual scenario that they're talking about, that they're concerned about, that they would make an exception to the general rule as stated in PACE Industries is not factually applicable here. And that's not something the district court has to figure out as a matter of fact? I don't believe it is because we've got their claims in the record about when Novapharm would have come to market and that they would have then been able to buy at a lower price. There is some discussion. It wasn't made an oral argument, but there's some discussion about tolling. Right. Tolling does not apply here under any circumstance, and that's because under this Court's decision last August in Henry Hanford nuclear litigation, tolling only applies when an individual plaintiff files its claim after the class certification decision, and here the claim was filed two years before, and Hanford's right on point on that subject matter. I'm sorry to have delayed you so long. You wanted to talk about the merits. I'd like to talk about whatever Your Honors would like to talk about. I would like to address the claim about the Sumika reference because I think there have been some slightly off-point statements factually about what was in the record. Now, the whole Japanese application was submitted with the 207 application, and the patent attorney testified he believes he submitted the whole English translation, he wanted to submit the whole English translation, and if he did not, that was a mistake. Now, did he discuss the Sumika reference in his application on the 207 patent? I know that he specifically discussed it, and there's evidence in the record of this in his deposition that it was discussed in a face-to-face meeting where Mr. Jansen, the patent attorney, was there, Mr. Wong, the assistant patent examiner, who was the one actually in the meat of things, and Ms. Tseng, who was Mr. Wong's boss or the first-level patent examiner, and as Mr. Jansen recounts in his deposition, and it's undisputed, Ms. Tseng said to Mr. Wong, did you consider the Sumika reference in determining prior art, and Mr. Wong said yes. Let me make my question a little more precise. In the papers submitted in connection with the 207 application, did Abbott Labs discuss the Sumika reference? I don't believe that's in the record, Your Honor. I'm sorry. What do you mean it's not in the record? I don't believe it's in the summary judgment record exactly what the discussion was. On the papers that were submitted? I believe that's correct, Your Honor. And you had the papers available to you, and you could have submitted them as part of the summary judgment? Yes, Your Honor. Okay. My point about the Sumika reference, though, is when you, these IDS forms, the forms you submit, it's just a list. You say, here's the potential prior art, here's the potential other patents. It's just it's a form, and it has a list of items, and you just list them all down. And there's never been a requirement that when you list them all down, you then go into a long narrative discussion of them. So you say it was listed in the 207 patent? Absolutely. The Sumika reference was listed. That's the point. The reason it was listed in an abstract was provided in English, and the whole patent was provided in Japanese. And it was thought by the patent attorney that he also provided the translation. But the patent examiner doesn't remember whether the translation was provided or not, but he notated on the face of the application. It's not in, it's notated abstract only next to the checkmark saying full translation submitted. The patent examiner doesn't remember if the full translation was submitted, and as plaintiff's expert agrees, sometimes documents go in and somehow they, you know, get lost. But it is with the 095 application. You cut me off. I apologize. You give me more information. Is it in the file wrapper? The full translation is not in the file of the 207 patent, only the abstract in English, but the full Japanese is. Which matches the docket, the list of documents. It matches the handwriting notation on the file wrapper, yes, Your Honor. So those two things are consistent, and so what you would have to have had if that thing had been submitted, you would only not have the problem that it would be absent even though it was submitted, which could happen, but it would also be absent from the notation as having been observed as to be submitted, right? You would have to have those two mistakes both back to back. If it is submitted and then lost before the patent examiner gets into the meat of things, then it would have... Did you hear my question? I did. I'm trying to be responsive as I understood it, Your Honor. I apologize. Both would have to be wrong. I understand that the abstract only would have to be wrong, but it all depends on when the patent examiner is looking at it, whether it's lost before or after. If it's lost before he gets there and checks the box or writes the notation, then it doesn't mean anything because it's gone missing beforehand. The notation is made when? We don't know when the notation is made, but it's not as though it's a file stamp entry like in this court on a docket sheet. But you're presenting it as having been made when the examiner actually gets down to examining the documents. It could be made as documents come into the file. As I understand, the process is that he, when he's going through it, he makes this notation. When he, the examiner, is going through it? Yes, Your Honor. It's in the examiner's handwriting. He testified to that. It's his handwriting. It's not some clerk's handwriting. I'm not saying this is what happened. I'm saying there's no evidence that this isn't what happened. I certainly have no idea what happened. Certainly a jury could draw an inference from that that it wasn't submitted. I think a jury could perhaps draw an inference that it wasn't submitted, but I don't think there could be any inference either of any wrongful intent at the Walker process standard or that it made any difference whatsoever. Let's just stick with the question I asked. A jury could draw an inference from this that it wasn't submitted. I think that's correct, Your Honor. It's not maybe about it or perhaps. A jury clearly could. I think a jury could draw an inference. I think it's a bit speculative. Let me put it to you a different way. If a jury did draw that inference, this record would support it. We would not have to reverse for lack of evidence, right, on that point? I think it would depend on what the other evidence is, Your Honor. When you've got evidence that he says he submitted it and you've got evidence that the expert says these things do go missing, so it's not conclusive. Let's assume all of those things, and the jury nevertheless finds it was not submitted. Would we reverse? I'm hesitant to say what Your Honors would do, but I understand the point. I understand what Your Honor is saying. I don't dispute the point, Your Honor. I'm reading from ER 174. It's page 48 of the district court's opinion in which she says that, well, the full English translation was submitted during the pendency of the 2007 application in connection with the 095 application and the 2007 patent issued anyway. I'm having a little trouble figuring out, although I've come to a conclusion on it, but you can help me. At first, I was inclined to read that passage from the district court as no harm, no foul. That is to say, the patent examiner saw the English translation of the Tsumiko reference and, having seen it, understood its significance and nonetheless granted the 2007 patent. Yet, as I read that further, it looks to me as though it's not a no harm, no foul. It is a question as to what the intent was, because she goes on to the district court, goes on to say, patent issued anyway. It did, even assuming Abbott's counsel's conduct was questionable, the uncontroversial evidence is that it did not impede full consideration of the Tsumiko reference. Plaintiffs have failed to provide evidence that would allow a reasonable person to conclude that there was a willful and knowing misrepresentation. So it sounds as though, in the end, the district court is not saying no harm, no foul. The district court is saying, instead, because it was submitted with the 095 application, I'm unwilling to find fraud when it was not submitted with the 207. Is that how you read the district court? I've always read it as, I guess, a slight variant on the no harm, no foul. Under Walker process, you have to have a clear showing of but-for causation. And there can't be any but-for causation here, because Mr. Wong testified not only that it was in the 095, in the 095 wrapper, but that he saw it, that he looked at it. If you look at his testimony. Did he also testify, and I understood it's import, and understood it's import in the context of the 207 application? He testified that he did not recall on those issues. Yeah. But he doesn't have to. I mean, he's got it there. But we're back to the summary judgment question, then. I don't think we are, Your Honor, because if he's got it, and it says in the SER in 173, do you recall reading that reference? Yes, I did look at it. Did you read it? Yes, I read it. He recalled reading the reference to crystal form A-2, which is the format issue here, in SER paragraph 182, and also the table referring to the crystal forms and their characteristics. He recalled reading the chemical formulas. When he had it and when he considered it, you can't say that if we had submitted it with the 207, or but-for not submitting the full application with the 207, the result would have been any different, because he still would have looked at it, considered it, and given it whatever weight he determined was appropriate. But the fact that he looked at it in one place instead of another has no bearing on that. Do we know from the record? I confess I don't know as I sit here. Do we know in the record the time frame, that is to say, when the patent examiner was looking at the 095 and when the patent examiner was looking at the 207? How far separated were those two events in time? It is in the record, and they were being, well, let me just turn to that. But I'm trying to figure out how likely it is he would have had one in mind as he thought as he did the other. Oh, well, he said in his testimony, when I was considering the 207, I had it because it had been submitted in the 095. Not I remembered it from the 095, but basically I got it. He didn't use these words. I got it from the 095, but I had it. It was there. Right? And I looked at it. I understand that. But that's not my question. My question is, as he makes his mind up with respect to 207, when is that in comparison of when he's making his mind up and reading and considering the Simico translation in connection with the 095? The application for the 095 was filed, I'm reading from the stipulated facts in the ER at 99, paragraph 48. It was filed on May 20, 1994. The patent issued on May 2 of 1995. I believe that, well, let's go to the 207 patent. That application was filed on October 18, 1994, and the patent issued on April 2, 1996. So the applications have... There's some overlap. Some overlap, but not complete overlap. Yeah. Okay. But, in any event, I guess I come back, Your Honor, to the very strict Walker process standard and the absolute requirement of a clear showing of but-for causation. And there just cannot be any showing of but-for causation when he actually has exactly what they say we should have submitted, the English translation, in front of him in conjunction with the patent. Well, but-for causation, and I'm not sure if this is precisely the point you're arguing, but I have to say that the Simico reference invalidates the 207 patent, correct? No court, and I'm glad you brought that up, Your Honor, because I heard that just a moment ago, and no court has ever held that the Simico reference invalidates the 207 patent, and Abbott's folks certainly didn't think so. They have submitted an expert report saying that, in their view, the Simico reference invalidates it. But certainly the patent examiner didn't agree. But isn't the Simico process the very same one that produces the drug that is your on-sale bar problem? We do not know their process, and when we got their diagrams and their peaks, we didn't think they matched up with ours. We didn't think they were producing the same thing. That's what our scientists believe. That's what's in the 095, that we don't think it's the same thing. Now, their person disagrees. Their expert disagrees. But the point for this is, is that, you know, they don't say, and no reasonable mind could say otherwise, they don't say that it's sham to say otherwise. They have an expert who says one thing on Simico, and the patent examiner considered it and thought differently. And is that why the 207 patent is still valid? We're not claiming the 207 patent is still valid because of the Federal Circuit holding, sir. I see. And why did this Federal Circuit hold that it wasn't? The Federal Circuit held that it wasn't because of the on-sale bar, nothing to do with the Simico reference. You're backing yourself up into Judge Fletcher's question. Wasn't it because of the Simico patent? It is not clear where the materials and the process by which the materials got to the United States, which were then involved in the on-sale transactions. I believe one of them came, there's some evidence of where they came from, but there's no evidence that they were intended to be produced as Form 4. But that terrazosin hydrochloride was produced, and it in fact included Form 4 within it. Okay. Thank you. Thank you, Your Honor. We have a little time left. Do you wish to address the Berkey-Ford argument? Yes, let me start with that. The Pace case was a competitor case. It was not a purchaser case. And if you take it, the four years prior to the suit as a purchaser, between March of 98 and August of 99, when the generic came on the market, Kaiser in that period was paying approximately 70 cents per hydrin pill, as opposed to roughly 10 cents per pill once the generic came onto the market. So there's no doubt that there were antitrust injury and damages during that period if the court adopts the Berkey photo purchaser rule. With respect to the ---- But the opposing counsel says that even if you adopt the rule, the numbers don't the timing doesn't work out. No. That's where we respectfully disagree, Chief Justice Kuczynski, because there was injury. No doubt there was injury in that period beginning at four years up to the period when the generic came on the market. Explain to me how. The suit was filed in March of 2002, working four years back under the Sherman Act, March of 98. At that time, Kaiser was paying roughly 70 cents per pill. The generic did not come onto the market until August of 99. And that ---- When could it have come into the market but for what you claim is a patent? Well, I think the question of that kind of causation is one that is ultimately wrapped up in how Abbott and Geneva were able to manipulate the market. And Berkey photo makes very clear that where there is an antitrust violation, you do not penalize the purchaser who was suffering harm as a result of prior acts that occurred before the four years. That would, in effect, insulate the antitrust violators from the harm to competition that they are causing. And so for that reason, applying the Berkey photo rule here, there is clear injury in that 18, roughly 18-month window. And that would be sufficient on which a jury could find significant damages. Now, if I could just address the point that, Judge Fletcher, you raised about how to interpret the MDL court's passage in 174. If you look at it as no harm, no foul, the court was wrong because the evidence in the record from Britton and Manbeck said this was clearly material to the patentability, the Sumica reference. If you look at it as was there intent to defraud, the court was wrong because Manbeck on page 82 of the extracts of records says this was clearly so important, it had to be material, and the Abbott lawyers had to have known that it was material. And it was a startling omission not to put in a written declaration trying to explain away the Sumica reference in light of the very close parallel. Scalia. That's a pretty weak showing, isn't it, if the language is correct, particularly if your opposing counsel is correct as to the law. It seems to me that but for causation requires something larger than simply that counsel must have known what it was doing when it filed papers, which on the surface does not create the indication. Well, in fact, I think if Manbeck's declaration, which I urge the Court to look at carefully because he was a longtime head of the patent office and patent lawyer for a distinguished corporation, a lot of experience here, and he says that if you take Britain's testimony about the materiality of the Sumica reference, it's inescapable that the Abbott lawyers would have figured out that they needed to do something to address the importance of Sumica in this 207 patent application. And because of the importance of candor, because the PTO process is an ex parte process, it would be reasonable to infer an intent not to include the translation because we're talking about a half a billion dollars a year in profits. And Abbott made about $2 billion by extending the life of this monopoly over a four-year period in which he kept the generics out. Thank you. Thank you, cases. I understand it's a minute. We'll next hear argument in space exploration technologies versus Boeing.
judges: Kozinski, O'scannlain, Fletcher